Moser et al. *v.* Jacob Brown Building and Loan
Association et al., Appellants.

Argued December 4, 1935. Before FRAZER, C. J., SCHAFFER, MAXEY, DREW, LINN and BARNES, JJ.

*Harry Shapiro,* with him *James B. Lichtenberger,* for appellants.

*Thomas Burns Drum,* with him *Ballard, Spahr, Andrews & Ingersoll,* for appellees.

OPINION BY MR. JUSTICE LINN, January 6, 1936:

This action, brought against three defendants—two building and loan associations and a trust company—involves (1) a claim to recover a down payment made by plaintiff and (2) a counterclaim by the trust company

against him. The jury allowed his claim and disallowed the counterclaim. The defendants appealed at No. 285 and No. 320 alleging error in refusal of motions for judgment n. o. v., in rulings on evidence and to instructions to the jury.

Thirty-nine lots with improvements were the subject of the contract of sale. The legal title was in one Melville, who held for the Pennsylvania Company for Insurances on Lives and Granting Annuities, referred to as the trust company. The trust company held first mortgages on each of the properties; second mortgages were held by one or other of the building associations. By written contract dated January 16, 1933, made by plaintiff, the two building associations and the trust company, the building associations agreed to convey the properties to plaintiff, who pursuant to the contract, paid $6,500 to the trust company but to be returned in case of vendors' default. Plaintiff had the option of taking all at once, or at least one-third at a time; settlement was to be made in 90 days for not less than one-third, and if only one-third was taken at the end of 90 days, the remaining two-thirds were to be taken at 180 and 270 days respectively after the date of the agreement. The conveyance was to be "clear of all liens and encumbrances," title to be "good and marketable and such as will be insured at regular rates by any responsible title insurance company; otherwise the Buyer shall be repaid his deposit money paid on account and shall also be reimbursed for the cash outlay he may have been put to for title insurance." Time was made of the essence of the agreement, and tender of deeds and of purchase money were expressly waived. Defendants stipulated, in the agreement, that all the houses were rented at $45 a month. The agreement also provided: "Pending the consummation of this agreement, the deposit money shall be held by the Pennsylvania Company for Insurances on Lives and Granting Annuities, and shall

be paid over to the Sellers in the event of final settlement as hereinbefore provided, or in the event of default as hereinbefore provided." The first 90-day period ended Sunday, April 16th, making the last day for settlement, unless extended, April 17th. When that time arrived there was a default. The transaction so outlined also involved the following conditional arrangement: The trust company, desiring to get back its investment, secured by first mortgages on the properties, was directly interested in making the sale. In consequence of its participation in the negotiation for the sale, it regarded itself indebted to a broker, Hawthorne, for services rendered in procuring the plaintiff as purchaser. During the passing of the 90-day period, plaintiff applied to the trust company for assistance in purchasing, asking the company to lend him $1,800 on each house and lot (which was less than its existing investment) and taking purchase-money mortgages as security. The company's view is that it agreed to make the loans for three years at six per cent and that plaintiff agreed to pay Hawthorne's commission; plaintiff denied that he agreed to pay Hawthorne.

The verdict must be understood as determining either that the contract alleged to support the counterclaim was not made, or that the default in conveying on April 17th discharged plaintiff from satisfying Hawthorne, as something that was to be done only on condition that the written agreement to convey the properties was carried out.

In support of his view, plaintiff relied on letters exchanged between him and the trust company before the date fixed for settlement. On March 3, 1933, he wrote: "I understand . . . that W. M. Hawthorne has made some claim to you for commission which has or has not some basis for justification; but as I do considerable business with Mr. Hawthorne I will agree to cause him to withdraw his claim for commissions in the event you

so kindly agree to help my client" [in fact, the plaintiff, himself] by taking the purchase-money mortgages. The trust company replied on March 15th that it would take the mortgages, but that "This agreement, however, is based upon your ability to obtain from Mr. Hawthorne formal withdrawal of his claim for commission." We understand that to mean that if the vendors conveyed, the trust company would lend the money and take the mortgages as security on condition that plaintiff satisfied Hawthorne. A witness on behalf of the trust company testified that on April 21st he informed plaintiff that "he [plaintiff] would have to agree to [pay Hawthorne's commission] before he would get the mortgages. And this he agreed to do. Q. Who agreed to do that? A. Mr. Peace [plaintiff]. Then I called Mr. Mancill [attorney for Hawthorne] and I told him that I thought that they had reached an agreement in which Mr. Peace was to take care of this $2,184. . . ." On May 12th, long after plaintiff had made his demand for the return of the down payment, the trust company paid Hawthorne the amount now counterclaimed. The arrangement was unilateral, a request for an act to be done by plaintiff in return for defendant's promise; no obligation to lend the money would arise until plaintiff performed by obtaining Hawthorne's release.

We come now to the default. We have stated the manner in which the legal title was held and the mortgage encumbrances, showing the respective interests of the three defendants. April 17th was the day for settlement according to the written agreement. On April 11th, counsel for the defendant building associations wrote to plaintiff as follows: "The Sanford Road Properties [which were the subject of the agreement] are listed for Sheriff sale on Saturday, April 22, 1933, at 9:30 a. m. The sale will be held at the Sheriff's office in the Court house, Media, Pa." Nothing was done by any of the parties (unless by oral negotiations which plaintiff dates

before April 11th, and the trust company after April 17th, and which will be referred to later) until April 24th when plaintiff made written demand for the return of the down payment. In his letter he based his right on two grounds: (1) that the vendors had been unable to deliver title clear of encumbrances by April 17th; (2) that the properties were not all rented at $45 a month. At the trial it was also shown that on March 13, 1933, a bill was filed in the Common Pleas of Philadelphia against Melville, the legal title holder, by a plaintiff claiming an interest in the properties (and for decree accordingly) and that the suit was not discontinued until more than a year later. It was contended that this litigation also constituted a cloud on the title against which title insurance at usual rates could not be obtained.

It is clear that the defendant building associations did not have the legal title to convey on April 17th. The trust company could not have had Melville make the conveyance on that day even if plaintiff had been willing to accept Melville's warranty as grantor (see Hopkins v. Phillips, 76 Pa. Superior Ct. 243, 245) because the trust company was cognizant of the suit against him and, in such circumstances, could not permit the title to be insured as marketable and clear of encumbrances. To make conveyance to plaintiff possible, it was therefore necessary, so far as the record shows, to have a foreclosure of the mortgages and purchase at the sheriff's sale by the building associations.

Defendant's letter of April 11th advising of the foreclosure sales by the sheriff on April 22d, gave notice that defendants were not prepared to convey clear on April 17th as they had agreed to do. During the 90 days following the date of the agreement, they had ample time to arrange to perform. The verdict must also be understood as establishing that plaintiff did nothing with regard to the notice of April 11th, until his letter of April

24th demanding the return of the down payment; that plaintiff's conversations (either personally or by Wilson) which the trust company alleged to have occurred April 21st and on which defendants rested the claim of plaintiff's waiver of performance by them on April 17th, occurred prior to April 11th, as plaintiff contended, and were therefore not evidence of waiver after plaintiff received the notice of April 11th.

What was the legal effect of defendant's letter of April 11th? Appellants do not deny that it gave notice, at least, of intended breach of contract. They deny that it had the effect attributed to it by plaintiff. They say that the effect of nonaction by the parties from April 11th to the time the trust company received plaintiff's letter of April 24th, demanding back the down payment, is governed by the following rule which they quote from Barber Milling Co. v. Leichthammer B. Co., 273 Pa. 90, 93, 116 A. 677: "A mere notice of an intended breach [of contract] is not of itself a breach of the contract. It may become so if accepted and acted on by the other party. . . . The notice of an intention not to perform the contract, if not accepted by the other party as a present breach, remains only a matter of intention, and may be withdrawn at any time before the performance is in fact due. . . . The promisee may treat the notice of intention as inoperative and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of nonperformance. But in that case he keeps the contract alive for the benefit of the other party as well as his own; he remains subject to all his own obligations and liabilities under it, and enables the other party not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstance which would justify him in declining to complete it." They contend that plaintiff "Having allowed the stated time to go by, neither party could suddenly terminate the contract without giving the other an

opportunity to perform": Dravo v. Rees & Sons Co., 291 Pa. 387, 392, 140 A. 148.*

Parties by agreement may alter the effect of general rules. These parties did so. They agreed that "Formal tender of deed and tender of moneys is hereby waived. In the event that Sellers are unable to deliver title to the premises on or before any of the dates fixed herein for settlement, liability of the Sellers is to be limited to the return of the deposit money with interest at six per cent, computed to the date of return." If the "contract [would have been kept] alive" (in the words of the case quoted above) until April 17th "for the benefit of the other party as well as his own," waiver would not result from nonaction; this follows because the parties agreed that nonaction should not have the usual consequences; they agreed that neither tender of deed nor tender of purchase money need be made to put the other in default, or, in other words, for any purpose for which a tender would otherwise be required. The stipulation displaced the effect of the operation of the general rule and substituted the result agreed upon by the parties; in addition, they provided that the effect of breach should be, not the usual general liability for all damages resulting, but only that the down payment should be returned with interest; the general consequences of nonperformance were not to be incurred; a substitute was provided: Myers v. Fidelity-Phila. Trust Co., 290 Pa. 283, 288, 138 A. 834.

The parties had also agreed that time was of the essence of performance; that provision was not for the sole benefit of the vendors, as they now contend; the contract shows it was for the benefit of both parties, and that intention will be given effect: McHenry v. Mitchell, 219 Pa. 297, 68 A. 729; Bank v. Hagner, 1 Peters 455, 465. See also Williston, Contracts, volume II, section

---

* On the general subject, see Restatement, Contracts, section 318 and the Pennsylvania annotations to that section.

847; Stichney v. Keeble (1915), A. C. 386, 415. Cf. Benner v. Berman, 82 Pa. Superior Ct. 312. We cannot therefore accept appellants' contention that plaintiff's silence from April 11th to April 17th disqualified him, until a reasonable time thereafter, from insisting on their default.

Giving the record the effect which we think must be given, as outlined above, we may attach no importance, in passing on the appeals, to the assignment of error concerning the efforts made to show that some of the houses were rented at less than $45 a month (11th assignment). We recognize on this record, without resort to the evidence of expert witnesses, that title insurance could not have been obtained insuring the title clear of encumbrances on April 17th at regular rates. We also agree that, in the circumstances stated, the assignments of error to portions of the charge cannot be sustained, and that, after what has been said, they need not be discussed separately. The entire transaction must be viewed as a unit; the supplementary agreement of the trust company to lend money to and take from plaintiff the purchase-money mortgages was made part of the whole transaction; its promise to lend the money was necessarily conditioned on performance by the building associations of their agreement to convey clear; if they failed, plaintiff would be under no necessity of borrowing and the trust company would not be required to lend on the first mortgages proposed; unless the vendors conveyed, plaintiff could not make purchase-money mortgages; the trust company was therefore as much a party to the general transaction as the building associations were; their default prevented the happening of the contingency on which plaintiff agreed to satisfy Hawthorne's claim.

The court correctly instructed the jury (17th assignment) that a verdict could not be found in favor of the trust company on the counterclaim unless the jury also found that plaintiff was not entitled to recover the down

380

payment. The affirmance of the defendant's point to the contrary was not warranted by the record, but fortunately did no harm.

The judgments are affirmed.