622 A.2d 381

Craig E. DAVIS and Karen L. Jensen–Davis

v.

NORTHRIDGE DEVELOPMENT ASSOCIATES, and
Wertz, Hoffman, Parks Realtors, Appellants.

Superior Court of Pennsylvania.

Argued Jan. 28, 1993.

Filed March 25, 1993.

284

Scott L. Huyett, Reading, for appellants.

Lee Sapira, Wyomissing, for appellees.

Before McEWEN, POPOVICH and BROSKY, JJ.

BROSKY, Judge.

This is an appeal from the final judgment of the lower court. Appellants present the following issues for our review: (1) whether the trial court erred in refusing to enter judgment notwithstanding the verdict in favor of appellants with regard to appellees' cause of action; (2) whether the trial court erred in refusing to enter judgment notwithstanding the verdict in favor of appellants with regard to their counterclaim against appellees; and (3) whether the trial court erred in charging the jury, thus necessitating the award of a new trial on both appellees' cause of action and appellants' counterclaim.[1] For the reasons set forth below, we affirm the judgment.

Before proceeding to address appellants' claims, it is necessary to recount the relevant facts of this case. During 1988 and 1989, Northridge Development Associates (NDA) was developing a tract of land, identified as "Northridge," by constructing residential dwellings thereon. Pursuant to an agreement with NDA, Wertz, Hoffman, Parks (WHP) was appointed as the exclusive Realtor for the housing development and was completely responsible for marketing and selling the lots at Northridge. In October 1988, appellees Craig Davis and Karen Jensen–Davis[2] visited a friend who had purchased a residence in the Northridge community. Appellees were so impressed with the construction of the home and the community that they decided to have a similar structure built on lot no. 20, which adjoined the lot owned by their friend. As a result, appellees placed an initial deposit on the

---

1. The issues, as phrased in appellant's statement of the questions, are unduly prolix and confusing. We have accordingly reformulated the issues in the manner set forth above.

2. Appellees were husband and wife at the time they entered into the construction agreement. However, Mr. and Mrs. Davis formally separated in September, 1989 and were divorced in May, 1990.

property and executed a formal construction agreement on October 24, 1988.[3]

The construction agreement expressly provided that appellees would purchase the house for a total of $152,490.00[4] and that settlement was scheduled for June 30, 1989. Although the contract contained a "time is of the essence" clause pertaining to the date of settlement, the agreement permitted the settlement date to be extended upon the mutual written consent of the parties. Pursuant to the contract, NDA could also unilaterally extend the time of settlement in the event that construction delay resulted from weather conditions, acts of God, material or labor shortages, or strikes. After the written agreement was executed, appellees paid the remainder of the deposit in two installments. The total deposit on the property was $15,520.00 which was placed into an interest-bearing escrow account by WHP.[5]

NDA began working on the Davis lot in April, 1989. Because of the steep slope of the land, the lot had previously been back-filled to make the lot level. Soil was then removed from the lot for the construction of the foundation. Due to the particular conditions of the lot, extra excavation and the construction of a sub-foundation were required so that the home would have a stable foundation. Construction of the sub-foundation and foundation, however, was delayed because

3. The agreement was between NDA and appellees. However, employees of WHP, as NDA's agent, submitted the agreement to the parties. WHP also drafted the agreement and negotiated the terms of the agreement, such as the settlement date or changes in the appearance of the home with the prospective buyers.

4. The base cost of the house was $150,990.00. NDA had a policy pursuant to which it would not construct two identical dwellings next to each other. Because appellees wanted a home which was identical to that owned by their friend and had purchased a lot next to their friend, appellees were required to alter the front of their home so that it would have a different appearance. The cost of these modifications was $1,500.00. Consequently, the purchase price increased to $152,-490.00. Additional charges in the amount of $7,399.26, which arose out of further changes in the construction of the house and the installation of upgraded fixtures such as carpeting, siding and lighting, were subsequently included to bring the final cost of the home to $159,-889.26.

5. By the time of trial, the account contained $17,522.43.

of the inordinate amount of rain which fell in the area during the spring months. However, the basement walls were eventually poured in June, 1989. At this time, appellees observed a crack in the walls. Appellees informed appellants of the existence of the crack and were told that it would be repaired.

Because of the delays, appellees realized that the house would not be completed and ready for settlement by June 30, 1989. Appellees attempted to ascertain when settlement could take place but were unable to obtain a definite date from appellants. After observing a continuing lack of progress on the home, as well as continuing mud and water seepage from the cracked foundation, appellees contacted counsel who informed appellants by letter dated July 27, 1989 that appellees were no longer interested in purchasing the home and sought a return of their deposit because of the expiration of the mortgage commitment, the passage of the June 30 settlement date, and the persistence of the cracked foundation.[6] Appellants' counsel responded by letter dated August 9, 1989 which advised appellees' counsel that NDA intended to fulfill its obligations under the construction agreement. Appellants further indicated that appellees' had been notified of appellants' intent to postpone the settlement, that the crack in the basement had been repaired, and that appellees' mortgage commitment had been extended. No further communication was exchanged between the parties.

NDA did not finish construction of the house until October. Appellants then notified appellees that settlement would be held on October 17, 1989. Appellants and the mortgage company attempted to hold a settlement on this date. However, appellees did not attend. The home was eventually sold six months later in April, 1990 for the sum of $157,100.00.

On October 12, 1989 appellees instituted this action against appellants to recover their deposit and damages resulting

6. At the time appellees initially advised appellants that they were no longer interested in purchasing the home, appellees also contacted the carpet, cabinet, siding, lighting and other suppliers to cancel their orders for the upgraded items which they had agreed to purchase. Despite appellees' cancellation, NDA nevertheless installed the upgraded items in the home.

from appellants' failure to have the house fully constructed and ready for settlement by June 30. Appellants filed an answer and a counterclaim in which they sought to recover either appellees' deposit or the actual losses sustained as a result of appellees' refusal to purchase the house.[7] A jury trial was held in August, 1991 following which the jury found in favor of appellees and awarded them $2,921.65 in damages. The trial court later molded the verdict to include the return of appellees' deposit. Consequently, appellees were awarded a total sum of $20,444.08. Appellants filed timely post-trial motions which the trial court denied. The verdict was then reduced to final judgment. This timely appeal followed.[8]

Appellants first contend that the trial court erred in refusing to grant their motion for judgment notwithstanding the verdict with regard to four counts of appellees' complaint.[9] Appellants further argue that their motion for judgment notwithstanding the verdict should have been granted with respect to their counterclaim. Our scope of review of a motion

7. NDA calculated its total losses to be $15,844.90.

8. Appellants indicate in their brief that they are appealing from the order of May, 1992 which denied their motions for post-trial relief. *Appellants' Brief at 2 (text of the order in question). Appellants are in error as an order denying a motion for post-trial relief is interlocutory and unappealable. See, e.g., Note, Pa.R.A.P., Rule 301, 42 Pa.C.S.A. However, appellants correctly stated in their notice of appeal that this is an appeal from the final judgment entered on June 3, 1992. We will therefore disregard appellants' misstatement as the record clearly shows that this is an appeal from a final judgment which is properly before this court.

9. Appellees' complaint was divided into five counts, the first four of which concerned NDA. In the first count, appellees' sought recovery of their deposit and compensation for all of the expenditures resulting from NDA's failure to convey the home on June 30, 1989. Thus, count I was premised upon NDA's breach of contract. Count II of the complaint alleged that NDA had breached the agreement by failing to provide good and marketable title to the premises. In count three, appellees' sought recovery based on NDA's breach of the express warranties in the construction agreement in constructing the premises with a cracked and leaking foundation. Count IV sought recovery for the same defects, however, this count was based on NDA's breach of the implied warranties of habitability and construction in a reasonably workmanlike manner. Count V, which was directed at WHP, requested that WHP return the deposited funds held in the escrow account based on NDA's alleged breaches of the agreement.

for judgment notwithstanding the verdict has been set forth as follows:

> The entry of judgment notwithstanding a jury verdict to the contrary is a drastic remedy. A court cannot lightly ignore the findings of a duly-selected jury. Thus, in considering a motion for judgment n.o.v., the court must view the evidence and all reasonable inferences that arise from the evidence in a light most favorable to the verdict winner. The court can enter judgment n.o.v. only if no two reasonable persons could fail to agree that the verdict is improper. In deciding a motion for judgment n.o.v. we consider all evidence actually received, [regardless of] whether the trial court's rulings thereon were correct or incorrect[, since] [t]he erroneous receipt of evidence is corrected by granting a new trial.

*Niles v. Fall Creek Hunting Club, Inc.*, 376 Pa.Super. 260, 264–265, 545 A.2d 926, 928–929 (1988) (*en banc*) (citations and quotation marks omitted). *Accord Perry v. Booth Maternity Center* (1993), slip op. at 3–4, Nos. 01341 and 01342 Philadelphia 1992, 1993 WL 49803 (filed 3/1/93). We will examine appellants' arguments in accordance with this standard.

■ As indicated above, Count I was premised upon appellants' failure to hold settlement on June 30, 1989 in conformity with the "time is of the essence clause" contained in the construction agreement. To ascertain whether judgment notwithstanding the verdict should have been granted on this count, it is necessary to set forth the relevant legal principles. Our Supreme Court has recognized that "even though the time fixed in an agreement for settlement is stated to be of the essence of the agreement, it may be extended by oral agreement or be waived by the conduct of the parties, and where the parties treat the agreement as in force after the expiration of the time specified for settlement it becomes indefinite as to time and neither can terminate it without reasonable notice to the other." *Warner Company v. Mac-Mullen*, 381 Pa. 22, 29, 112 A.2d 74, 78 (1955). *Accord Cohn v. Weiss*, 356 Pa. 78, 81–84, 51 A.2d 740, 742–743 (1947). Nevertheless, "[w]here time of settlement is made the essence of the contract for sale of real estate, it still remains the essence of

the contract, although a definite extension of time has been granted." *Wasserman v. Steinman,* 304 Pa. 150, 154–155, 155 A. 302, 303 (1931). Moreover, "it is well settled that even where time is not of the essence, the time for completion is not unlimited and must be reasonable under the circumstances." *Commonwealth v. Pendleton,* 480 Pa. 107, 113, 389 A.2d 532, 535 (1978). *See also Glover v. Grubbs,* 367 Pa. 257, 259, 80 A.2d 75, 76 (1951) (providing that where no time is fixed for settlement, it is presumed that a reasonable time was intended). "Reasonableness is a question for the fact-finder and [is] determined by consideration of all existing circumstances." *Reagan v. D & D Builders, Inc.,* 277 Pa.Super. 140, 143, 419 A.2d 700, 702 (1980). It is also well settled that a buyer's tender of performance is excused where the seller has expressly repudiated the contract or has indicated that he is unwilling or unable to perform. *See, e.g., Donnelly v. Suess, Inc. v. Lilley,* 12 Pa.D. & C.2d 383, 386, 74 Montgomery County Law Reporter 298, 301 (1957), *affirmed per curiam on the basis of the trial court opinion,* 393 Pa. 32, 33, 142 A.2d 284, 286 (1958); *Glover v. Grubbs,* 367 Pa. at 259, 80 A.2d at 76; *Sunseri v. Mancuso,* 362 Pa. 161, 163–164, 66 A.2d 830, 831 (1949); *Phillips v. Tetzner,* 357 Pa. 43, 47, 53 A.2d 129, 131–132 (1947); *Messina v. Silberstein,* 364 Pa.Super. 586, 592–593, 528 A.2d 959, 961–962 (1987), *allocatur denied,* 518 Pa. 619, 541 A.2d 746 (1988).

■ Mindful of these considerations, the record reveals that in May 1989, appellees became concerned that the house would not be completed by June 30 and that their mortgage commitment would expire.[10] N.T., Vol. I, 8/12/91–8/15/91 at 140–141. Appellees discussed these matters with Mike Anderson, an associate of WHP who acted as NDA's agent in

---

**10.** Appellees' mortgage commitment letter expressly provided that the mortgage commitment would expire on June 30, 1989. Plaintiffs' Exhibit 9 at 1 (Commitment Letter issued by Meridian Mortgage, dated 1/24/89). The commitment letter further stated that at the option of the lender, the commitment could be extended at either the same terms or at the current market rate. *Id.* However, the commitment letter added that the lender would attempt to offer a comparable product if settlement did not occur prior to the expiration date of the commitment. *Id.* at 2.

the negotiation of the construction agreement and subsequent discussions with appellees. Mr. Anderson informed appellees that the house would not be completed and ready for settlement by June 30. *Id.* at 188 and 191–192. Appellees attempted to ascertain when the residence would be finished but were unsuccessful in obtaining any response from appellants. *Id.* at 142, 144, 145 and 188–189. Appellees indicated that they would have accepted the house provided that it was completed within a reasonable time, *i.e.*, three or four weeks. *Id.* at 142, 145 and 190. Aside from the construction of the foundation in the latter part of June, appellees did not observe any further progress in the construction of the home. *Id.* at 134–135, 136 and 142. However, other residences in Northridge were completed and settlement was made thereon during the same time period that appellees' house was under construction. *Id.* at 73–47. Through the testimony of its principal, Douglas Young,[11] NDA indicated that it could construct a dwelling in less than ninety (90) days under normal circumstances. *Id.* at 103–104. Douglas Young also testified that settlement could not have occurred by July 27, 1989. *Id.* at 116–117.

Based on this evidence, appellants were not entitled to judgment notwithstanding the verdict with regard to count I. In this case, appellees were at all times ready and willing to tender performance, although a tender by appellees would have been futile since appellants were admittedly unable to fulfill their obligations under the contract at any time prior to July 27. Further, appellees would have been willing to accept a postponement of the settlement date provided that their house would be completed within a "reasonable" period of time and that their mortgage commitment would be honored. They therefore attempted to discover when they could expect the house to be completed and settlement thereon to occur. Appellants were indifferent to appellees' inquiries and put forth absolutely no effort between June 30 and July 27 to continue construction of appellees' residence even though they were

11. Douglas Young was the president of Douglas Young Builders and Northridge Development Corporation. Northridge Development Corporation was a general partner of NDA. NDA contracted with Douglas Young Builders to construct the homes in the Northridge Development.

able to complete construction on other homes in the development and proceed to settlement thereon. The parties' conduct thus evidences a lack of mutual agreement to waive or extend the settlement as well as a lack of intent to treat the contract as though it remained in force after the expiration of the settlement date. *Compare Cohn v. Weiss*, 356 Pa. at 79–81, 51 A.2d at 741–742 (in which the agreement of sale contained a time is of the essence clause, but the parties agreed to several extensions of the settlement date and expressed their willingness to enforce the contract after the expiration of the initial settlement date). Under the circumstances present here, *i.e.*, the lack of a mutual agreement regarding an extension of the settlement date and the lack of intent to enforce the contract after the settlement date expired, appellants cannot avail themselves of the rule set forth in *Cohn v. Weiss* to justify their own inexcusable and material breach in failing to have the house fully constructed and ready for settlement by the date set forth in the contract. Consequently, appellants are not entitled to have judgment notwithstanding the verdict entered in their favor as to the first count of appellees' complaint.

 With regard to count II, we note that neither of the parties presented evidence of a defect in title.[12] However, we note that appellees bore the burden of establishing a defect in title in support of their action to rescind the contract. *See Groskin v. Knight*, 290 Pa. 274, 279, 138 A. 843, 844 (1927) (providing that the purchaser had the burden of showing that he had the right to rescind the agreement based on alleged defects in title). Because appellees did not offer any proof of the alleged defects in title, they failed to sustain their burden of proof. Accordingly, the trial court erred in refusing to grant appellants' request for a non-suit as to count II. This

12. After the close of appellees' case, appellants requested that an involuntary nonsuit be entered with respect to counts I–IV of the complaint. N.T. Vol. I, 8/12/91–8/15/91 at 211–214. In arguing the motion, each of the parties asserted that the other bore the burden of proving a defect in title with respect to count II of the complaint. *Id.* at 211–212. The trial court declined to definitively resolve the dispute and denied the motion. *Id.* at 212.

error, however, was later rectified since the question of whether appellants breached the contract by failing to convey good and marketable title was never submitted to the jury and did not form any part of the jury's verdict. *See* N.T., Vol. II, 8/12/91–8/15/91 at 364 (in which the trial court refused appellees' proposed jury instructions relating to defects in title). Appellants' motion for judgment notwithstanding the verdict as to count II was therefore properly denied.

■ Appellants further challenge the trial court's failure to enter judgment notwithstanding the verdict with regard to counts III and IV of the complaint. As explained above, these counts respectively sought recovery based on NDA's breaches of the express contractual warranties and the implied warranty of habitability by tendering a house with a cracked foundation. Appellants assert that they are entitled to judgment in their favor because the warranties would only become effective upon actual transfer of the home to the purchasers. Pursuant to the position suggested by appellants, a buyer would be required to purchase a defective home and institute action to recover for the damages. We reject appellants' approach as it is illogical and contrary to the law of Pennsylvania.

In this case, the construction contract expressly provided that the workmanship, materials and construction of the residence would be warranted for a period of one year from the date of settlement. Plaintiffs' Exhibit 1 (Construction Agreement, dated 10/24/88, and Builder's Warranty), at 1 and 9. Although the warranty became effective upon the purchaser's acquisition of the property at the time of settlement, it is ludicrous to suggest that the house need not comply with the requirements of the warranty prior to settlement and that the house could be tendered to the purchaser in such condition. Rather, it is implicit in the agreement that the builder will construct a house in accordance with the express warranties and that a house, so constructed, will be tendered to the purchaser at the time of settlement. This court has reached similar conclusions with regard to the implied warranties of habitability and construction in a reasonably workmanlike

manner by recognizing that such warranties arise at the time the construction contract is executed. *Groff v. Pete Kingsley Building, Inc.*, 374 Pa.Super. 377, 385, 543 A.2d 128, 132 (1988), *appeal dismissed as having been improvidently granted*, 523 Pa. 421, 567 A.2d 1041 (1990). Where the residence does not conform to either the express or implied construction warranties, the purchaser is not required to accept the dwelling in such condition and may elect to rescind the contract.

In this case, there is no question that appellants breached both the express and implied warranties. Appellees observed the crack in the foundation in June. N.T., Vol. I., 8/12/91–8/12/91 at 136–137, 139 and 205. Appellees apprised appellants of the crack and were told that it would be repaired. *Id.* at 137–138. However, appellants initial attempt to repair the crack was unsuccessful and the house continued to leak. *Id.* at 56. In fact, water and mud stains were observed by appellees and were photographed as late as the time of the attempted settlement in October, 1989. *Id.* at 150–151 and Plaintiffs' Exhibits 17–24 (Photographs of the cracks and water/mud stains filmed at appellees' behest in late October). Douglas Young even conceded that it was "not normal" to have cracks in the foundation of a residence. *Id.* at 115–116. A residence with a cracked and leaking foundation, which had not been repaired as of the time of settlement, clearly was not constructed in accordance with either the express or implied warranties. Under these circumstances, the trial court properly denied appellants' motion for judgment notwithstanding the verdict with respect to the third and fourth counts.

In conjunction with their challenge to count IV, appellants further argue that they are entitled to judgment notwithstanding the verdict insofar as recovery on the basis of negligence is sought in this count. This claim is without merit. At trial, appellees proceeded on the theory that appellants had breached the expressed and implied warranties and did not attempt to prove negligence. N.T., Vol. I., 8/12/91–8/12/91 at 215. The trial court similarly noted that the case did not involve negligence. *Id.* The jury was not instructed on negligence principles, and the question of whether appellants were negligent

was never submitted to the jury for consideration and did not form any part of the verdict. Accordingly, appellants were not entitled to judgment notwithstanding the verdict on this basis.

Appellants next argue that the trial court erred in refusing to enter judgment notwithstanding the verdict on their counterclaim. Appellants concede in their argument that their ability to recover on their counterclaim is contingent upon a favorable resolution of their first issue, *i.e.*, that they are entitled to a judgment notwithstanding the verdict that they did not breach the construction agreement with appellees. As we have found that appellants are ineligible for relief on their initial claim, their arguments relating to their counterclaim necessarily fail.

In their third and final claim, appellants assert that the trial court erred in instructing the jury with regard to appellees' cause of action and appellants' counterclaim. In reviewing the trial court's instructions to the jury, we apply the following standard:

> Where the motion for a new trial is based upon the sufficiency of the jury charge, we must examine the charge in its entirety against the background of the evidence to determine whether error was committed. If an appellate court concludes that the charge was erroneous, a new trial will be granted only if the jury charge might have prejudiced the appellant. A new trial will be granted even though the extent to which the appellant had been prejudiced is unascertainable. An alleged inadequacy in jury instructions constitutes trial error if the jury was probably misled by what the trial judge said or there is an omission in the charge which amounts to fundamental error.

*Ottavio v. Fibreboard Corp.*, 421 Pa.Super. 284, 294–295, 617 A.2d 1296, 1301–1302 (1992) (*en banc*) (*per curiam*) (citations omitted).

Appellants assert that the trial court's instructions were confusing and erroneous. We have reviewed the trial court's jury instructions in accordance with the above standard and conclude that they adequately, clearly and correctly set forth

the applicable principles of law which we previously discussed with regard to appellants' request for judgment notwithstanding the verdict. N.T., Vol. II, 8/12/91–8/15/91 at 433–434 and 435–437. Appellants are therefore ineligible for relief on these grounds.

Judgment affirmed.