# Dowd v. Scenic View Farms Inc.

C.P. of Carbon County, No. 13-0576

*Richard S. Bishop*, for plaintiffs.
*Thomas R. Elliott, Jr.*, for defendants.

NANOVIC, *J.*, Dec. 15, 2014—Whether an agreement to sell real estate is enforceable by the buyer when neither the buyer nor the seller has tendered performance by the closing date set forth in the agreement, which date is expressly stated to be of the essence of the agreement, is the primary issue in this litigation. A secondary issue is what becomes of the title to real estate when the grantee named in a deed of conveyance does not exist, here a corporation which had never been incorporated.

## PROCEDURAL AND FACTUAL BACKGROUND

On Saturday, February 2, 2013, John and Tina Dowd, husband and wife ("buyers"), and Peter Martin, in his capacity as sole shareholder and officer of Scenic View Farms, Inc., a Pennsylvania corporation ("seller"), signed an agreement for the purchase and sale respectively of a 115 plus acre farm owned by Scenic View Farms, Inc. to the Dowds for a purchase price of $500,000.00 (the "agreement"). The agreement called for the conveyance of title by general warranty deed, did not contain a waiver of formal tender of the deed of transfer or of the purchase price, provided that "[s]ettlement shall take place within 30 days of the signing [of the agreement] at a time and place agreed to by the parties," and stated that "[t]ime is of the essence of this agreement." Title to the real estate which was the subject of the agreement was to be "good and marketable and free and clear of all liens, restrictions, easements, encumbrances, leases, tenancies and other title objections, except for the "clean and green" designation... and [ ] public utility easements whether or not recorded." The agreement was signed by Peter Martin under seal in his capacity as president of the Seller and had been prepared by Mr. Martin's counsel.

Settlement was not held by March 4, 2013, (i.e., within thirty days of February 2, 2013), nor has it occurred to the present time. Why, is the subject of the instant action for specific performance commenced by the buyers by praecipe for writ of summons filed on April 1, 2013.

On the same date the agreement was signed, after its execution, Mr. Martin told the buyers he would be in touch with them about settlement. (N.T., 10/9/14, p.91). The next communication the buyers received was an e-mail from Mr. Martin's son, Paul Martin, on February 13, 2013, who

advised that they had met with Peter Martin's accountant and would be meeting that same day with Peter Martin's attorney, that some paperwork needed to be put in order which might take a few weeks, and that he would keep the buyers updated on their progress. Next, the buyers received a second e-mail from Paul Martin on February 26, 2013, asking on behalf of Peter Martin and his immediate family that the agreement be canceled. A third e-mail sent by Paul Martin on March 2, 2013, inquired as to whether the buyers had made a decision on the earlier request to rescind the agreement.

After receipt of the second e-mail, Mr. Dowd spoke with Peter Martin, asked if this was his desire, and was told by Mr. Martin that his son, Paul Martin, had full authority to act on his behalf. (N.T., 10/9/14, pp.53, 95-96). On March 3, 2013, Mr. Dowd e-mailed the buyers' response to the seller's request to void the agreement. In this response, Mr. Dowd wrote that while he understood the importance of the property to the Martin family, it was also important to his family; that the property was the only large piece of land adjacent to the home where he and his wife resided and that they hoped someday to have their children live near them; and that the discussions between him and Peter Martin for the sale of the property had been ongoing for several years, were not spontaneous, and that it was Mr. Martin who had approached him in late 2012, at which time an oral agreement was reached, which was reduced to writing by Mr. Martin's attorney and signed two to three months later. Mr. Dowd concluded his e-mail by expressing his interest to have closing in March.

On March 12, 2013, the buyers' settlement agent forwarded a deed, settlement statement, seller's affidavit,

and several other settlement documents to be signed by Peter Martin to the seller, tentatively scheduled closing for March 20, 2013, and asked that the enclosed documents be returned prior to closing. In a typewritten response dated March 15, 2013, signed by Peter Martin, in which he referred to himself as the seller's president, Mr. Martin wrote that because closing had not occurred within thirty days of the date the agreement was signed, and because time was of the essence, buyers were in breach of the agreement which he was thereby terminating. At this point, buyers, who had previously not been represented by counsel, obtained counsel who sent a letter dated March 19, 2013, to the seller wherein buyers disputed that they had violated the agreement and requested that settlement proceed in accordance with their settlement agent's letter of March 12, 2013.

When this did not occur, buyers commenced the present action for specific performance as previously stated. Buyers' complaint was filed on July 18, 2013. A bench trial was held before the court on October 9, 2014 and November 20, 2014.

## DISCUSSION

Performance as a Condition to Enforcement — Who Bears the Burden

Implied in every contract in Pennsylvania is an obligation on each party to act in good faith and to deal fairly with the other party. *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. 1992). If the contract is silent as to the time of performance, the law implies a reasonable period. *Field v. Golden Triangle Broadcasting, Inc.*, 305 A.2d 689, 694 (Pa. 1973). If the contract states a date by

which performance is to occur and this date is not met, the law allows a reasonable period to cure, unless there is some additional factor, such as a willful refusal to perform or injury to the non-breaching party which cannot be compensated for in damages. *Morrell v. Broadbent*, 140 A. 500, 505-506 (Pa. 1928). However, where the settlement date fixed in an agreement is stated to be of the essence of the agreement, "courts will ordinarily accept the agreement as made and refuse to decree performance in the event of failure to make payment within the stipulated time," *Morrell*, 140 A. at 506, unless such time is extended by agreement or waived by the conduct of the parties, in which event, "where the parties treat the agreement as in force after the expiration of the time specified for settlement it becomes indefinite as to time and neither can terminate it without reasonable notice to the other." *Davis v. Northridge Development Associates*, 622 A.2d 381, 385 (Pa. Super. 1993) (quoting *Warner Company v. MacMullen*, 112 A.2d 74, 78 (Pa. 1955)). "It is also well settled that a buyer's tender of performance is excused where the seller has expressly repudiated the contract or has indicated that he is unwilling or unable to perform." *Davis*, 622 A.2d at 385.

In this case, both parties agreed that settlement would occur no later than March 4, 2013. With respect to their obligations under the agreement, delivery of the deed and payment of the purchase price were mutual, concurrent and dependent covenants. Yet, within this period neither party did what was necessary to consummate settlement: Seller failed to tender a deed and other documents reasonably requested for good and marketable title to pass, and buyers failed to tender the purchase money. (N.T., 10/9/14, pp.66-

67, 86).

Instead, after initially advising buyers that it needed additional time to get its paperwork in order, seller not only failed to advise buyers that it could not meet the agreement's closing date, but deliberately failed to communicate this fact believing that if buyers did not demand that settlement be held on or before March 4, 2013, it retained the right to terminate the agreement, which was its intention for reasons independent of when settlement was held. After Peter Martin signed the agreement on February 2, 2013, and told his son and daughter of the pending sale, they opposed the sale and wanted to prevent its occurrence for a variety of reasons important to them: the price was too low, the tax implications of sale,[1] and their desire to keep the property within the family. (N.T., 10/9/14, pp.50-51, 54, 71, 96). This notwithstanding that Peter Martin had been trying to sell the property for more than three years; that during this time the property had been listed with several real estate brokers and in fact was listed for sale at the time the agreement with the buyers was reached;[2] that the best offer previously received was

---

1. At trial, the buyers presented evidence from an accountant that projected the difference in the federal and state income tax consequences of the sale of the property to the buyers if the transfer were from the Seller, Scenic View Farms, Inc., versus from the individual, Peter Martin. (Plaintiff Exhibit No. 25). The total projected tax on the sale of the farm by the corporation, including tax on the distribution of the net cash proceeds from the sale by the corporation to Peter Martin, was $223,155.00. In comparison, if the farm were determined to be owned by Peter Martin and transferred by him directly to the buyers, the total projected tax was $111,511.00. The difference between these two figures is $111,644.00.

2. Four listing agreements with the seller, Scenic View Farms, Inc., identified as the owner, were admitted in evidence. The earliest is dated July 22, 2009. (Plaintiff's Exhibit No. 5). The most recent is dated February 9, 2012. (Plaintiff's Exhibit No. 8). This last agreement lists the property at a price of $699,900.00 and provides for the listing to expire

$450,000.00 (N.T., 10/9/14, p.44; Plaintiff Exhibit No. 20 (Deposition of Peter Martin, pp.56-57)); and that Peter Martin was elderly, in his mid-eighties, and in poor health.

In contrast to seller, who was looking for a way out of the agreement, within a week of signing the agreement, buyers contacted their settlement agent, an abstract company, to prepare for settlement. (N.T., 10/9/14, pp.49-50, 76). Buyers did not press seller for a settlement date when told seller needed time to put its paperwork in order, gently deflected Paul Martin's overtures to cancel the agreement, and timely suggested on March 3, 2013, that settlement occur that month. At no time prior to March 15, 2013, did seller insist on settlement occurring on or before March 4, 2013.

Seller never told buyers it would insist on time being of the essence until after the date for closing specified in the agreement had passed. To the contrary, seller's conduct reasonably led buyers to believe the date set for settlement in the agreement was not critical and would not be enforced. (N.T., 10/9/14, pp.97-98, 104-105; plaintiff Exhibit No. 20 (Deposition of Peter Martin, pp.52, 59)). By stating seller's paperwork for settlement would take several weeks to complete, failing to keep buyers advised of the progress of this paperwork, playing on buyer's sympathy to cancel the deal, and then being silent in response to Mr. Dowd's March 3, 2013 letter, knowing buyers were intent on buying the property, yet deliberately waiting until after the settlement date called for in the agreement before notifying buyers of its decision to terminate the agreement, and having made no tender of

at 11:59 P.M. on February 9, 2013.

a deed before the agreed-upon deadline for settlement, seller engaged in a course of conduct upon which buyers reasonably relied in believing that settlement by March 4, 2013 was not imperative, and then seller used this belief as the basis to declare the agreement void. This the law will not countenance. More to the point, by its conduct seller implicitly waived and/or is estopped from insisting on strict compliance with the agreement's settlement date.

At a minimum, common decency and fair dealing required that when Mr. Dowd turned down seller's request to cancel the deal on March 3, 2013, and advised buyers would like to complete settlement in March, seller should have replied that the deadline for settlement is tomorrow, March 4, and that unless closing is held by that time, there will be no settlement, rather than remaining silent for eleven days and responding only after receiving the settlement package from buyers' agent. Under the circumstances, buyers were justified in accepting seller's silence as an indication of its willingness to settle after March 4, 2013.

While courts of equity have the power to grant specific performance, the exercise of this power is discretionary.

The discretion which a court of equity has to grant or refuse specific performance, and which is always exercised with reference to the circumstances of the particular case before it, may, and of necessity must often be controlled by the conduct of the party who bases his refusal to perform the contract upon the failure of the other party to strictly comply with its conditions.... [Specific performance] is frequently ordered in favor of a party who has been for a considerable period in

default, if he has never abandoned the contract, and the other party has suffered nothing from the delay for which he cannot be compensated in the decree.... Whether time is or is not of the essence of the contract, if the vendor has waived strict compliance with its terms as regards time of payment, he cannot thereafter rescind or forfeit the contract, without notifying the purchaser of his intention to do so unless payment is made, and allowing him a reasonable time for performance.

*Cohn v. Weiss*, 51 A.2d 740, 742-43 (Pa. 1947) (quotation marks and citations omitted). This, seller never did.

The agreement was not contingent on financing and this was never an issue for buyers who at all times had the necessary funds available for settlement. Moreover, and critical to buyers' obligation to tender payment, seller never tendered a deed.

Where a contract imposes reciprocal duties on the parties and the ability of one to perform depends on performance by the other, it would seem plain that the latter's failure to perform within the time fixed for performance by the former would be a waiver of the time limitation. A party who is himself in default has no right to insist on rescission while in default, and where there has been indulgence on both sides, one party cannot suddenly rescind without notice to the other. After waiver, or where the agreement was originally indefinite, time does not become of the essence until notice be given by one of the parties, insisting on compliance within a reasonable time.

*Ephrata Water Company v. Ephrata Borough*, 20 Pa. Super. 149, 155 (1901) (citations omitted).

Specifically addressing the issue of the obligation to tender payment when a deed has not been tendered, when the agreement of sale does not contain an express waiver of formal tender, and when the agreement makes the date of settlement material to its performance, the Pennsylvania Supreme Court in *Cohn* stated:

> Another important element in this case is the fact, as found by the court below, that the defendants never tendered a duly executed general warranty deed nor the necessary affidavits as to existing judgments required to remove the objections of the title company. If the vendor intended to hold the vendee to a strict compliance to the terms of the agreement in respect to the time of settlement, he should have been meticulous about his own readiness to perform his part of the agreement at the time fixed for settlement. In *Lefferts v. Dolton*, 217 Pa. 299, 66 A. 527, 118 Am.St.Rep. 913, this court held that before a vendee is called upon to pay his money, he is 'entitled to see that the conveyance was properly signed, sealed, and acknowledged, and that the description of the land to be conveyed was correct.'

> In the instant case the court below correctly said: 'In the absence of an express waiver of formal tender, the vendors were under a duty to appear at the stipulated time and place for performance and produce a duly executed instrument. Until this was done, the vendee could not be called upon to make payment or to proceed in the performance of her covenant. *We are confronted, thereforer with a situation in which both parties permitted the time for performance to pass. Having allowed the stated time to go by, neither party could terminate the contract suddenly without giving*

*the other an opportunity to perform.'*

> In *Irvin v. Bleakley*, 67 Pa. 24, which was an action of assumpsit for breach of contract for the purchase and sale of property, this court said: '...whichever of the parties first desired to enforce performance was bound to regard his part of the contract as a condition precedent, and perform or offer performance in order to enable him to proceed to enforce the contract.' This doctrine was reiterated by this court in *Heights Land Co. v. Swengel's Estate et al.*, 319 Pa. 298, 179 A. 431, 432, where it said: 'It is equally well established that a tender of performance on the part of plaintiff is prerequisite to a decree for the specific performance of a contract for the sale of real estate; he who seeks equity must do equity.'

*Cohn*, 51 A.2d at 743-44 (citations omitted) (emphasis added). *Cf. Moser v. Jacob Brown Building & Loan Ass'n*, 182 A. 531, 533-34 (Pa. 1936) (holding that in an agreement of sale in which time was of the essence, and tender of deeds and of purchase money were expressly waived, waiver of time is of the essence of the agreement would not result from a failure to tender, because the parties had agreed that neither tender of deed nor tender of purchase money was required to put the other in default).

A second reason why tender of payment of the purchase price by buyers on or before March 4, 2013 is not a precondition to specific performance is that seller was not in a position to convey good title by this date. Although buyers were not told of this fact, Paul Martin acknowledged this inability due to the title issue discussed below. On this point, our Superior Court stated:

[A] court may grant specific performance if a contract specifies that "time is of the essence" even if the buyer fails to tender where it is uncontradicted that any such tender would have been a futile act. Specific performance is foreclosed as a remedy if two elements are present: (1) the buyer has not tendered by the specified date; and (2) the seller has effectively denied that such tender would have been futile. In the instant case, the sellers have not denied that they were unable to convey good title on May 2, 1983. Tender by the buyer would have been futile.

*Messina v. Silberstein*, 528 A.2d 959, 962 (Pa. Super. 1987). This futility is dramatically illustrated in this case since, as explained below, as of March 4, 2013, seller was no longer in a position to convey good and marketable title.

Deeding Property to a Non-Existent Corporation — What is the Effect on Title

The second issue which needs to be decided in order that good and marketable title will be conveyed to the buyers is from whom title to the property should be transferred. This issue arises because after the agreement was signed, by deed dated February 24, 2013 and recorded on March 15, 2013, the seller conveyed title to the property to "Scenic View Farms, a *de facto* partnership, Albert Misciagna and Peter Martin, general partners." This deed, according to seller, in fact conveyed no interest in the property, but was a deed of correction whose sole purpose was to have the records in the recorder of deeds office properly reflect who is the real owner of the property.

As explained by the seller, included in the recorded chain

of title for the property is a deed dated August 20, 1974, from Elmer E. Shoenberger and Florence G. Shoenberger, predecessor owners, to Scenic Farms, Inc. (Plaintiff Exhibit No. 1). Scenic Farms, Inc. was a non-existent corporation, as articles of incorporation had never been filed. In a second deed dated August 2, 1976, and designated as a deed of correction, the Shoenbergers purported to re-convey title to the property to Scenic View Farms, Inc., a Pennsylvania corporation, the designated seller in the agreement. Scenic View Farms, Inc. was incorporated on September 15, 1975. (Plaintiff Exhibit Nos. 2, 3). Defendants contend that this second deed from the Shoenbergers was a nullity; that having previously conveyed title to the property to Scenic Farms, Inc., on August 20, 1974, the Shoenbergers were no longer the owners of the property; and that even though Scenic Farms, Inc. was a nonexistent corporation, the effect of this transfer was to convey title to a *de facto* partnership consisting of Peter Martin and his brother, Albert Misciagna. Consequently, defendants contend the February 24, 2013 deed from Seller to Scenic View Farms, a *de facto* partnership, did nothing more than create a paper trail on the public record to evidence who the real owner of the property is.

Buyers claim that the transfer from the Shoenbergers to Scenic Farms, Inc., a non-existent corporation, was a legal nullity, and that the subsequent transfer by the Shoenbergers to Scenic View Farms, Inc. actually conveyed title to the property to the seller. Consequently, buyers argue that the February 24, 2013 transfer by the seller to Scenic View Farms, a *de facto* partnership, was not only unnecessary, but in fact transferred title to the property to Albert Misciagna and Peter Martin, and acted to frustrate, if not

prevent, the transfer of good and marketable title to the property by seller to buyers as required by the agreement.

In reviewing this history, we agree with the buyers' assessment of the law, but disagree that seller acted in bad faith, finding instead that seller's reliance on the advice of counsel was in good faith, albeit in error. "A deed that purports to convey real estate to a nonexistent corporation has no effect." *Borough of Elizabeth v. Aim Sher Corporation*, 462 A.2d 811, 812 (Pa. Super. 1983) (holding that where an owner of property deeded the property to a corporation which had not been incorporated, no articles of incorporation having been filed, and which did not have any *de facto* existence before the filing of articles of incorporation over a year later, the transfer was void *ab initio*); *see also Lester Associates v. Commonwealth*, 816 A.2d 394 (Pa.Cmwlth. 2003) (*en banc*) (holding that where the grantee, a named corporation, did not exist at the time of the purported conveyance and was not capable of taking title, title to real estate did not pass and no real estate transfer tax was owed). Seller's reliance on *In Re Gibbs' Estate*, 27 A. 383 (Pa. 1893) is misplaced.

In *Gibbs' Estate* the court discussed whether evidence presented by a bank customer was sufficient to establish that the bank, which had failed and was in receivership, was a general partnership, not a corporation which it purported to be, in order that the customer could proceed against the individual assets of the estate of one of the bank's shareholders, whom the customer claimed was a general partner. Without deciding whether the bank was properly incorporated, the court held only that the customer failed to make out a *prima facie* case that either the deceased shareholder was a partner, or the bank a

general partnership. The court did not hold that a failure to incorporate (or an imperfect incorporation) *ipso facto* results in a *de facto* partnership.

In the instant case, the evidence presented showed that Peter Martin and his brother, Albert Misciagna, intended that title to the property be in the name of a corporation whose shares they owned. Although no corporation existed in 1974 when the transfer to Scenic Farms, Inc. was made, Scenic View Farms, Inc. was incorporated a little more than a year later and a second deed conveying title to the property from the Shoenbergers to this corporation was filed of record. No evidence was presented to the contrary.[3]

In any event, whether Peter Martin is the owner of the property by virtue of the 1974 deed transfer from the Shoenbergers to Scenic Farms, Inc., or the 2013 transfer from Scenic View Farms Inc. to Scenic View Farms, a *de facto* partnership, as of this date, he is the owner of the property and the grantor from whom title should be transfer to the Buyers.[4]

---

3. The 1976 deed from the Shoenbergers to Scenic View Farms, Inc. states, *inter alia*:

> And the original deed into Scenic Farms, Inc. dated August 20, 1974, was erroneous in that said corporation had not been legally incorporated at the time the deed was executed and delivered and when the charter was granted, it was granted in the name of Scenic View Farms, Inc. The purpose of this deed is to correct the name of the grantee, Scenic View Farms, Incorporated.

(Plaintiff Exhibit No. 3). The Articles of Incorporation for Scenic View Farms, Inc. expressly state that Albert Misciagna and Peter Martin are each the owner of 10 shares in this corporation and, in the registry statement, Albert Misciagna is identified as the president and Peter Martin the secretary of the corporation. (Plaintiff Exhibit No. 2). Since its incorporation, property taxes have been billed to the seller in its corporate name (Plaintiff Exhibit Nos. 17, 18) and seller has a clean lien certificate (Plaintiff Exhibit No. 23) which, according to buyers' accountant, signifies that corporate tax returns are being timely filed on seller's behalf.

4. At the outset of the first day of trial on October 9, 2014, the following stipulation between counsel was made part of the record:

## CONCLUSION

The date for settlement provided in an agreement of sale imposes duties upon both parties to the transaction. When the agreement expressly makes the date of settlement of the essence of the agreement, this date is waived when neither party tenders performance by the settlement date and neither tender of the deed nor tender of the purchase money has been waived in the agreement. Under these circumstances, neither seller nor buyer has the right to do absolutely nothing when the other proposes a settlement date beyond the period called for in the agreement and

Mr. Elliott: Let me say this, the purpose for correction deed was to abate the possibility of there being a problem actually closing. You will notice that in my pleadings-and this was a thing that was specifically considered-we felt it was disingenuous on our part to argue that even though Mr. Martin was a principal and had been principal since very beginning, whether partnership or president of corporation, to us it didn't matter because we were prepared to close based upon correction deed. In other words, we weren't going to say if they were on time, we were not going to say; guess what, you have a problem, the deed is in wrong party, title was never fixed. We would have given them a deed from the current owner as reflected in the correction deed.

The Court: Okay. So are you able to stipulate for these proceedings that in term of enforcement of the agreement if it should be specifically enforced, which is that they are seeking here, that who the owner of the property is, is non-issue.

Mr. Elliott: Yes, because I think that's the right thing.

(N.T. 10/9/14, pp.17-18).

In addition, pursuant to a transfer agreement between Peter Martin and Albert Misciagna dated February 2, 2009, Mr. Misciagna transferred "all of [his] 50% interest in Scenic View Farms, Inc." to Peter Martin. (Plaintiff Exhibit No. 4). In an acknowledgment, ratification and release agreement dated November 5, 2010, Albert Misciagna acknowledged and ratified the transfer of his shareholdings in Scenic View Farms, Inc. pursuant to the February 2, 2009 transfer agreement. (Defendant Exhibit No. 4). Finally, as to any individual interest Mr. Misciagna may have acquired by the February 24, 2013 transfer from the Seller to Scenic View Farms, a de facto partnership, any such interest was transferred, assigned and relinquished to Peter Martin on February 25, 2013 by the first supplement to the February 2, 2009 transfer agreement and acknowledgment, ratification, and release agreement. (Plaintiff Exhibit No. 13, paragraph 1).

then refuse to perform.

Specific performance should only be granted "where the facts clearly establish the plaintiff's right thereto; where no adequate remedy at law exists; and, where the chancellor believes that justice requires it." *Payne v. Clark*, 187 A.2d 769, 771 (Pa. 1963). Here, both the seller's conduct in deliberately allowing the settlement date to pass with the intent of voiding the agreement, having led buyers in the meantime to reasonably believe that settlement by this date was no longer material to performance, and the seller's failure to tender a deed, with no proven evidence of prejudice to seller by the delay, persuade us that we should permit the buyers a reasonable period from the date of this decision within which to complete settlement.

Finally, we believe it is not without significance that seller's decision to terminate the agreement had nothing to do with the settlement date being scheduled approximately two weeks after March 4, 2013. This was a subterfuge for the real reason underlying the decision, Peter Martin's change of heart because his son and daughter were against the sale. We understand the dilemma Mr. Martin faced, making a choice between what he had agreed to and what his children wanted, however, the law does not excuse performance because of second thoughts.